First case of the morning is 414-0589, People of the State of Illinois v. Devon Ohlsson. For the appellant, Ms. Redwood, and for the appellee, Mr. McNeil. May it please the Court and Counsel, good morning. The defendant, Devon Ohlsson, submits that Deputy Reaches, in this case, violated the Fourth Amendment and the Fifth Amendment applicable to the states through the Fourteenth Amendment. A Fourth Amendment seizure occurs when, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. Taking the defendant from within his own home without a warrant is presumptively unreasonable under Payton v. New York. The initial presumption of unreasonableness was not overcome by the state's evidence in this case. When police approach a person in a closed environment, such as in their home, rather than out in public, the Fourth Amendment inquiry is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. Now, if there was voluntary consent to leave the home, the Fourth Amendment is not violated. Since 1968, in Bumper v. North Carolina, the United States Supreme Court and other courts following it have consistently held that it's the state's burden to prove voluntary consent. And that can't be discharged by showing no more than acquiescence to a claim of lawful authority. State argues that defendant's act of leaving the safety of his own home was voluntary. The state, therefore, had the burden to prove that defendant consented and that the consent was voluntary and that the consent was not a mere acquiescence to a show of lawful authority. Deputy Reaches testified that defendant stated he did not want to go back to the scene of the accident. Both Melissa, the girlfriend, and defendant testified that he repeatedly said no. No means no. Why didn't Deputy Reaches acquiesce to the citizen in his own home when he said, no, I'd rather stay home? The deputy had a hunch. He had an agenda. He didn't have probable cause for a DUI. He only had a hunch. So he insisted on the unnecessary. What should we do about the fact that the trial court believed the police officer? The trial court... Are we re-weighing the facts? Well, we do need to re-weigh the credibility determination. At the suppression hearing, the initial suppression hearing before Judge Kennedy, Judge Kennedy made determinations of credibility. Two witnesses testified there, Deputy Reaches and Defendant Olson. And the judge's determination of credibility against Defendant Olson was not what he observed on the stand, not any inconsistencies in testimony. But he said, well, he probably didn't have very good of a memory because he was tired, he was cold, he'd worked all day, and perhaps had some alcohol to drink. And those were the only bases of the credibility determination. But, if you read the transcript, at that hearing, Mr. Olson didn't say, I don't recall. I was too tired. I'm not sure. I had a blackout. I don't know what happened. He knew what happened. Now, the motion for suppression was under reconsideration in front of Judge Closs, a different judge. Judge Closs significantly made no determinations as to credibility on the record. He did find in favor of the state and convicted, but he didn't make independent credibility determinations. Rather, he deferred to Judge Kennedy's determinations at the first suppression hearing. Significantly, Melissa Gower did not testify at that hearing. No court made determinations of credibility as to her. We're submitting that the credibility determinations were against the manifest weight of the evidence because the determinations of credibility made by Judge Kennedy at the suppression were not based on what he saw, heard, observed of the testimony with his own eyes, but what he thought probably occurred back in December. It was unnecessary for the deputy to take Mr. Olson back to the scene of the accident to investigate the accident. The state, what evidence did the state have to prove? Now, not to suggest, but to prove voluntary consent. They didn't have any evidence to prove it. They completely failed in their burden of proof to prove voluntary consent to leave the home. On the other hand, the defendant's evidence about why he acquiesced to the authority is more compelling. The evidence is undisputed that Mr. Olson said no at least one time. All three agree to that. Both Melissa and the defendant testified that he repeatedly said no. Now, when the state had an opportunity for rebuttal of that evidence, there was none. The deputy didn't come back on the stand and say no. He didn't repeatedly say no. He only said it once. They had a chance to rebut that evidence and they failed to do that. The deputy didn't come up and testify. His memory was different or better or that they were lying. Basically, the state acquiesced to the defense testimony of several refusals to leave the home. Now, looking at the circumstances, would a person who had been up 16 hours, had worked a full day as a carpenter, got in a wreck, hurt his shoulder, and then walked two miles in the cold, voluntarily go out again? He wanted to go to bed and that's what he said. The evidence is undisputed that Deputy Reach has amped up his tone of voice and his volume after each refusal. May I interrupt you for a moment? Yes. I'm sorry, just bookmark where you're at here. But when you're talking about a seizure having occurred in the home, you're saying that he indicated no. And then isn't the evidence that the police officer said, well, my car is warm, you know, come on. And then he acquiesced, your client acquiesced. So it's, no, I prefer not to, it's cold. The officers said, you know, my car is warm. And then your client leaves. I'm just curious, you know, even if your client had initially expressed a desire to stay home, is it, no, I will not go with you, or no, I prefer not to go with you, and there's a discussion that makes it an acquiescence on the part of your client. Is that what happened here? Under the testimony, the deputy stated that Mr. Olson said, no, it's too cold, I want to stay home. And that the deputy then told him, well, my car is warm. Under Melissa's testimony and Mr. Olson's testimony, he stated another two times, no, I don't want to go with you, after he was told that the car was warm. He wanted to stay home. Melissa's testimony was not determined by any judge to be uncredible. And the deputy didn't take the stand in rebuttal and say, no, they didn't say that. He never took the stand in rebuttal. One of the circumstances that the court has to, has to use to determine is the defendant himself. Why would he acquiesce to go back? He testified that he didn't want more trouble, like perhaps a resisting or obstructing charge. That shows acquiescence to show of authority. There's also testimony about the defendant alerting the deputy during the field sobriety test that he had a bad leg, where he had been shot in the leg in 2006. Defendant testified at trial that in fact he was shot by a police officer when he didn't answer properly. Mr. Olson acquiesced under those circumstances. He didn't want to be shot. He didn't want to be arrested for resisting or obstructing. He thought that he had to go and his will was overcome. We're also alleging that the Fifth Amendment was violated. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom of action in any significant way. And that's directly from Miranda v. Arizona. Now we have questioning initiated by Deputy Regis. Where were you before the accident? How many alcoholic beverages had you consumed? Deputy Regis admits that he started the DUI investigation in his squad car. And how did Mr. Olson get to the squad car? We have custody or a deprivation of freedom of action in a significant way here. The defendant was searched. He was locked into the cage-like backseat of a squad car and transported back to the accident scene. Now the state argues that, well, all squad cars have a cage and they're locked. Well, that's true. But this court has admonished police officers as far back as 2008 and before that in People v. Gorman, if you don't want to run into problems with the Fifth Amendment, question the suspect in their home, in a park, or at a Burger King. Don't put them in the squad car. Cases repeatedly state that being locked into a squad car is custody. The defendant was in his own home. There's no reason why. If Deputy Regis wanted to conduct an accident investigation, your license, your car information, your insurance information, that could have been done right there in the kitchen. It was warm in the kitchen. But no, he had an agenda. He wanted to get the man in the car. He wanted this to be your typical DUI arrest, which is a Terry stop, and this was not a Terry stop. What did the deputy indicate the reason was, why he wanted to take the client back to the scene? To complete his accident investigation. And he said, you know the normal things. Get his driver's license, his insurance information, and information about the car. And that's all he could state. That's why he wanted him back there. I would submit to you that all of that information was there in the kitchen. If the vehicle that had gone off the road, your client's vehicle, was instead in some tow yard or a body shop at that point, and not in a ditch, you know, your argument is stronger. But here, this is fairly soon after the accident, and your client's truck is in a ditch. Is it more reasonable, would you concede, for the officer to want to take your client back to the scene at that point? I don't consider, I don't concede that it's more reasonable. It would be more reasonable to question him there. Because he didn't, he didn't ask him anything except, how did it happen? And my client told him, I swerved to miss a deer and I went into the ditch. He told him that in the kitchen. So there was nothing really at the scene to have to ask him about. And indeed, the deputy's own testimony was, what was his accident investigation, his license, his car information, and his insurance. That's it. That all could have been done there. The analysis wouldn't change if the car had already been towed. The place that the analysis changes is that this wasn't a Terry stop. Mr. Olson wasn't pulled over. He wasn't there at the scene. He had the accident. He left the scene. That's what breaks the chain of events. He was in his own home. The analysis would change if the deputy waited out there on the road for him to come home. He didn't. He was within the home. Defendant was within the home. And there, Peyton steps in to protect a person who's in his home. The defendant's answers, while he was in custody in the squad car, provided the probable cause to believe that a DUI had been committed and implicated defendant in the criminal activity. The evidence is uncontroverted that Deputy Reach has failed to advise defendant of his Miranda rights under the Fifth Amendment. Defendant even asked if he could call his lawyer. Now, that's significant. That's one of his rights under the Fifth Amendment. You have the right to counsel. He asked. No, the deputy said, you can't call your lawyer until you agree to the field sobriety test or you're going to go directly to jail. As I said, this wasn't your typical Terry stop, typical DUI stop case. It never was. However, the deputy treated it like your typical Terry stop. And that was his problem there. He failed to understand or he ignored the significance of removing the defendant from his own home, taking him back to the scene, and there acting like it was a Terry stop. It wasn't a Terry stop. The custodial interrogation in the squad car. And I've got the cases, Henry and E.R., from this district where the suspect was in a squad car putting somebody in a squad car and they're questioning him, them. Him without Miranda is a custodial interrogation. Miranda's required. Miranda would not be required if he asked the same questions in the kitchen. Now, we talked a little about the credibility of witnesses at the beginning. If I tell a citizen who I believe, I understand this is a point of contention, but he's actually asked to go back to the scene with me. Am I going to put him in the front seat? I wouldn't if I was a police officer. If I was giving a guy a ride, I wouldn't put him in the front seat. They don't put him in the front seat. I know. They put him in the back. They put him in the back seat. What's so unusual about that? It's not unusual, but it is custodial. He was put in the back seat. It's a K-20. If you're put in the back seat of a car, a police car, you're now in custody. Under the cases, that's correct. He's in the back seat of the squad car. It's locked. He's in a cage there. The question is, would a reasonable person feel free to get out and leave? At the suppression hearing, he testified he tried the door and he was locked. He couldn't. So even if he felt free to get out and leave, he couldn't leave. He was locked in there. Cases consistently show, and I've cited them in my brief, that being locked in a squad car in the back seat is a significant deprivation of your freedom to go where you want to go. So yes, there he was. In terms of what Justice Connacht was just asking you about, if in this situation, the truck, as opposed to being completely off the road in the ditch, is partway on the road, and the officer is concerned that the truck may be blocking traffic, needs the defendant to move the truck, and transports him from his home back to the scene. While he's in the back seat of the car, he's in custody. He would be in custody if the officer insisted he come and he said he didn't want to come. Now, we have to look at the facts as they existed. Melissa was there. She had driven him. She had went to the accident scene. It was just a couple of miles or so from their house. Went there, picked him up, and drove him. She could have drove there and moved the truck if the truck had to be moved. That wasn't the case. She could have drove the defendant to the accident scene. And the deputy didn't suggest that. Well, you know, you could have Melissa take you there. But really, what was the necessity of going to the accident scene? There was none. Well, this guy's truck is sitting somewhere that it's not his property, right? It's in the ditch on a country road, way out by Ludlow. Yeah, it's in the ditch. It had to be moved. A tow truck was called. So it wasn't obstructing traffic. In fact, well, I think all the justices are familiar with Illinois out in the boonies. There's not a lot of traffic on a lot of these country roads. So it's not a situation where it was blocking the interstate. No one, the, Lucas Rogers, the fireman who stopped on the way to call and report it, had been standing by until the officer got there. And then another officer came there. So there was a second officer at the scene. In case there needed to be anyone directed around it, which there didn't, there was a second officer already at the scene. And I wanted to talk a little bit about Deputy Reach's credibility. Deputy Reach's testimony at trial really is loaded with extremely significant details about Mr. Olson that are nowhere in his police report. First of all, Melissa told me that he was drinking. He agreed that was a significant fact that's nowhere in his report. I smelled alcohol from him in the house. He testified to that at trial, not at suppression, not in his report. I used my computer to run the plate. He didn't use his computer to run the plate. He admitted that on cross-examination. He followed the red Intrepid. There he pulled Melissa over in a driveway. He said he first went to the accident site, and nobody was there. The state's attorney asked him, were there any people around? No, nobody was there. That's not right. He didn't first go to the accident scene, and when he did go there, Lucas Rogers was there. I explained to him he was not under arrest. That's not in his report. Now, and I asked him if he had anything to drink after the accident, and he said no. That's not in the report either. If you read the deputy's report, it's four pages. It's extremely detailed. He devotes an entire paragraph to going back to the truck two times to try to find the insurance card. That's how detailed it is. He devotes an entire paragraph to how they discussed getting a tow truck. Yet, he doesn't have these very, very significant details in his report. I'm submitting to the court that he beefed up his testimony. On cross-examination, he admitted that his testimony was wrong in several places. He couldn't remember the facts. He had to refresh himself. Deputy Reaches is the person who had to refresh his recollection repeatedly. For these reasons, Your Honor, we ask that the suppression... One thing. Are you saying that he saw the red Chrysler product and followed it? He got information from Lucas Rogers, the volunteer fireman who reported to dispatch that the defendant had left the scene, said he wasn't injured, didn't need the police, left the scene in a red Intrepid. And that the deputy in his report said, I located the red Intrepid. He doesn't say in his report that he first went to the scene. He got this information from dispatch. He located the red Intrepid. He knew where the area was, and he followed it. He followed it directly to the defendant's residence where he lived with his girlfriend. He followed the car. Right. That means a visual sighting of the car and following it. That's right. That's what he testified in his... That's what he wrote in his report, that he followed the car. And Melissa's testimony substantiates that because after she dropped the defendant off out in the country, they had an argument. She dropped him off. He said, let me get out. I'm going to walk. So he followed the car, but he didn't see the defendant get out of it? That's right. He found this car and followed it when they were close to Ludlow for about five blocks. She saw the lights come on behind her. But he wasn't following when the defendant got out of the car, apparently. Correct. Correct. The deputy went back out looking for the defendant. That's another thing that he forgot. He didn't know what he did at the trial. The deputy didn't know what he did and what he wrote in his report. He kind of just like was flying by the seat of his pants at trial. Thank you. Thank you. Please support counsel. I want to clarify real quick before I forget. The defendant walked. He apparently had a fight with his girlfriend and got out of the red Intrepid before he got to his house. That's why. Okay. I thought you meant did he get out of the car at the house? No. Yes. And this would have been the deputy's testimony would have been he saw the I think it was sort of a simultaneous finally found the car when it pulled into the driveway or followed it a brief amount before it pulled into the driveway kind of thing. But it's important to not lose track of the fact that the trial court is always in the superior position to evaluate the credibility of both the witnesses. It's also worth pointing out that defense counsel is using both the motion to suppress testimony and the trial testimony. And if we're going to do that, then we have to also look at the inconsistencies and defendants trial testimony compared to his motion to suppress testimony at trial was the first time we heard of this story about him drinking more beers after the accident. He he admitted that this he'd never told anybody about this before. He didn't say it before he did the breathalyzer. He didn't say it before he did the field sobriety test. He told no one about this this these mystery beers that he drank after the after the accident that he had in his cooler in the back of his truck. So clearly the credibility problems in defendants testimony as compared to the consistency of his motion to suppress and trial testimony, his credibility was much more affected by his inconsistencies than the deputies. Also if I could focus here just initially on Ms. Redwood's primary argument I'll suggest and that is that a seizure occurred in the home. And she indicated that when the defendant said no I prefer not to go to the scene that that meant no and at that point after he left the house he was seized. So tell us why that is incorrect. Of course the Mendenhall factors. The first three Mendenhall factors undisputed aren't in contention here. The officer was by himself. There weren't several officers. Didn't display his weapon. Didn't touch the defendant. The use of language or tone of voice that's the one that I guess this could be considered under in the Mendenhall factors indicative of a seizure. There the deputies testimony was it was conversational. Did he say it was conversational? Well according to his testimony yes. He said would you go back to the accident scene with me. Then defendant's response was I'd rather not because it's cold. And just for clarification I don't mean to argue with you. Did he describe his tone of voice or did he just indicate his word selection? From the cold record there was nothing that described his tone of voice. However I don't see just by his word selection how his tone of voice could have been escalated or anything just by his two. Again the only thing he said after that was a clarification. And another statement. He said well it's warm in my squad car and you don't have to get out at the scene. Circumstances changed. He did have to get out at the scene based on his observations of him stumbling on the way to the car and then once in the confined space of the car smelling a strong odor of alcoholic beverage. At that point he had the reasonable suspicion to have him get out and perform the field sobriety test. But that is not concerned with his statement to defendant that it's warm in my car and you won't have to get out at the scene. After that according to the deputy the defendant went with him voluntarily. That's the testimony that the deputy had. The trial court is under no obligation to believe defendant's testimony just because of course he's going to testify inconsistent with that. He's going to say that defendant's, that the deputy's tone was escalating and again that's incomplete contention with the deputy's actual testimony which the trial court found more credible. Again this court should give great deference to that credibility. The trial court saw the demeanor of both witnesses and saw their mannerisms and everything else as they testified. Just because they didn't mention the witness's demeanor or mannerisms in their order as to why the deputy's testimony was more credible that doesn't mean that that wasn't taken into contention. Also it's important Justice Harris you noted this was an accident circumstance.  The deputy was under no obligation to just automatically believe defendant. Oh I'm fine I swerved to hit a deer. That's great. I still, the police still has I would say the requirement to investigate further. I mean there was at least a scene of an accident where nobody was that was involved in the accident. There's multiple reasons there could have been, there's numerous scenarios of accident circumstances here. Maybe the defendant swiped a pedestrian that was on the road, a bicyclist, maybe one of the passengers in the truck was seriously injured and he was trying to cover that up. There's multiple reasons for not only defendant or the deputy to further investigate, there's multiple reasons for defendant to also go back to the scene for any kind of beneficial visual cues he could give to the officer at that point. He could at least tell the officer yeah I swerved here, here's where the deer hid, there's deer hair or whatever to further substantiate his story. Under defendant's theory here basically the officer as soon as the defendant claims oh I'm fine, I don't need any help and nobody was hurt, the officer can't do any more investigating. Well that's just not the way it works and the officer had the authority and the duty to investigate further. Of course as the circumstances changed, as he observed more, he noticed the defendant stumble, he got information that they were drinking before the accident and then he smelled the strong odor of alcoholic beverage while in the confined car. At that point he had the reasonable suspicion to perform the field sobriety test. It's also important to note two things. The trial court noted that the deputy was in his house as the defendant was. It's undisputed that the deputy had consent to be in the house. The girlfriend invited him in. The defendant then showed up later. So the defendant was in his house when the deputy asked him if he would return to the scene. As the trial court noted, where are you more comfortable to refuse an invitation to go somewhere than your own home? It would be a different story if the defendant was out even on his sidewalk or on the street asked to return to the scene. No, he's in his own home. Still he volunteered to go back to the scene after it was told to him that it was going to be warm and he wouldn't have to get out back in the cold. Also important was the defendant didn't think he was under arrest subjectively. He didn't say anything about being under arrest until at the scene the officer said, I need you to get out and perform field sobriety tests. The defendant stated, will I be arrested if I don't? Clearly not only would a reasonable person not think they're seized at that point, the defendant himself didn't even think he was seized at that point. This court just two days ago, People v. Lake, Justice Appleton concurred on it, gave a couple good guidelines for just the totality of the circumstances of a seizure. A seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he is willing to listen. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Here it's clear that the defendant voluntarily agreed to go back to the accident scene with the officer. There was nothing in the record that suggested, well besides the defendant's incredible testimony, the deputy's testimony, there was nothing to suggest that his tone was demanding or commanding at all or that it escalated at all. It was simply a question followed by, I'd rather not, it's too cold, followed by a clarification form in my car. Then the defendant agreed. So clearly under the Mendenhall factors and the totality of the circumstances which People v. Lake talks about, there was no illegal seizure here. As far as the Fifth Amendment, the defendant being in custody in the back of the squad car, People v. Wright is pretty on point. I cited it in my brief. That's this court's opinion from 2011. In both cases, the defendant was placed in the back of the police car to return to his car at another site. In both cases, the defendant was patted down, placed in the back of the car, based on department policy. In both cases, the defendants were uncuffed. However, in Wright, the tone of the officer was a bit more commanding. In that case, the officer said, we need to go back to the car. It wasn't even a question to the defendant. It could be perceived as a command. Still, this court found the defendant wasn't in custody in the back of the police car. Here, of course, as I explained, the deputy asked the defendant and then clarified that it was warm in his car. So here, the tone was less commanding than Wright. Clearly, the defendant wasn't in custody. Also, the deputy specifically informed the defendant in the car that he was not under arrest. Clearly, like I said earlier, the defendant didn't even think he was going to be under arrest until his refusal to do the field sobriety test later. So clearly, pursuant to People v. Wright, the defendant wasn't in custody while riding in the back of the squad car. I would also state that it's not a per se rule that a defendant in the back of a squad car automatically means they're in custody. As I stated, People v. Wright clearly shows that that's not the case. So the totality of the circumstances show that there was no illegal seizure and the defendant wasn't in custody. And this court should affirm the trial court's denial of the motion. If there are no more questions, I thank the court. Thank you. Rebuttal? The question about the defendant having more beers after the accident not brought up at the suppression hearing is because it wasn't relevant to the question of suppression at all. The only thing it was relevant to is the finding of the BAC. And why didn't he tell anybody about these beers he drank? He's not a lawyer. I mean, if I was arrested, I'd certainly, if I had drank beers after the driving, I'd say that. But this guy isn't a lawyer. He's a carpenter. He didn't want to get himself in further trouble. And if you notice from the report, he doesn't make a lot of statements. Now, the deputy did not ever testify about his tone of voice at all. And the tone of voice was brought up at the suppression hearing. So he was aware of what the defendant was testifying about his tone of voice. Yet at trial, a trial was in conjunction with a motion for reconsideration of the suppression hearing. At trial, he didn't testify about his tone of voice. And more significantly, he never got up to rebut the testimony or denied the loud, louder, and more commanding tone of voice that he used in order to get Mr. Olson to acquiesce to his show of authority. On that issue, looking at just the words that were apparently spoken, at least according to the deputy, it would seem inconsistent that my car is warm, you wouldn't have to get out at the scene would be spoken in a loud, commanding tone of voice. Would you agree? I would agree that that necessarily wouldn't be a loud and commanding tone of voice. But on the other hand, both Melissa and Mr. Olson testified that he said, you need to come with me. You need to come with me. Repeatedly after Mr. Olson said no. And in his report, he didn't say, I asked him to come with me. He said, I had him accompany me. And that's what he wrote on the date of the arrest, December 12th. I had him. The state says, of course, that Mr. Olson is going to say that the deputy had a loud tone of voice as if he was being untruthful. And, you know, if the defendant really wanted to be untruthful, he could have beefed his story up more. He could have testified that he was grabbed, he was touched. What did Ms. Gower say about the tone of voice? Ms. Gower testified that the tone of voice got louder and more commanding. And she was there, and her testimony was not found to be uncredible by any court. Now, the deputy, the deputy didn't first go and investigate this accident to find out who was there, if anybody. And why is that? Because he was reported by dispatch, or he might have talked to Rogers, he might have talked to dispatch, but his report says, I got dispatched to an accident without injuries. That's why he didn't go there first. So this idea that he first has to go and investigate all these things, he didn't, and he didn't do that. There's no testimony of verbal consent. Okay? He didn't, Mr. Olson didn't volunteer to go. He didn't, not even in the deputy's report does he say, Mr. Olson said, yes, I'll volunteer to go. He said, I had him come with me, and there was no testimony at all anywhere of any verbal dissent. The idea of approaching a person and asking questions that was, that came from this court just a few days ago, is a Terry stop analysis. Of course you can approach any person on the street and ask questions. But that's not what happened. As I explained earlier, this came out of your Terry analysis when the defendant went home and he was taken from his home. The whole analysis would be different if he had sat in his truck and the officer came up to him, or if the officer, as in People v. Wright, had observed him driving, had observed him do this accident. In People v. Wright, the defendant voluntarily came out of the neighbor's house. The police officer didn't even talk to the defendant. He said to the neighbor, would you have him come out? And he came out voluntary. The defendant in Wright made unsolicited statements implicating himself right out there on the street before he got in the squad car. And he agreed to get in the squad car and go. This is not like People v. Wright. The arrest and custody are not synonymous either. And we have to recognize that distinction between when somebody is seized or in custody and when somebody is arrested. And please recognize that your ordinary carpenter on the street doesn't necessarily know the difference between seized and in custody and arrest, but he knows when he doesn't feel free to leave. Thank you. Thank you. We'll assess the readiness of the next case.